UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ROBERT JACKSON, | Case No.: 2:23-cv-00124-APG-DJA |
| Plaintiff | **Order Granting in Part Defendants' Motion to Dismiss** |
| v. | [ECF No. 17] |
| NEVADA DEPARTMENT OF CORRECTIONS, et al., | |
| Defendants. | |

Pro se plaintiff Robert Jackson sued the Nevada Department of Corrections (NDOC) and several NDOC officials under 42 U.S.C. § 1983 for allegedly violating his civil rights while incarcerated at Nevada's High Desert State Prison (HDSP). After screening, Jackson's remaining claims are against individual officials for First Amendment retaliation, Eighth Amendment cruel and unusual punishment based on yard time and dangerous confinement conditions, and Fourteenth Amendment discrimination.[1] The defendants move to dismiss these claims, arguing that Jackson failed to exhaust administrative remedies, his retaliation and discrimination claims are not sufficiently pleaded, and the officials are entitled to qualified immunity. Jackson responds that exhaustion is not appropriately addressed at this stage, he states valid claims, and the officials should not receive qualified immunity. For the reasons

---

[1] After screening, Jackson's First Amendment retaliation claim proceeds against Brian Williams, James Scally, Jeremy Bean, Jennifer Nash, and James Dzurenda. ECF No. 11 at 14. Jackson's Eighth Amendment claim based on indifference to dangerous conditions proceeds against Brian Williams, Scally, Dzurenda, Lee Daniels, Calvin Johnson, Nash, Bean, Julie Williams, and Frank Dreesen. *Id.* at 17. Jackson's Eighth Amendment claim based on insufficient yard time proceeds against Dreesen, Johnson, and Julie Williams. *Id.* at 20. Jackson's Fourteenth Amendment discrimination claim proceeds against Dzurenda, Daniels, Brian Williams, Johnson, Bean, Scally, Dreesen, Julie Williams, and Nash. *Id.* at 22."

below, I dismiss Jackson's Eighth Amendment claims without prejudice but deny the motion to dismiss his First and Fourteenth Amendment claims.

**I. BACKGROUND**

Jackson alleges[2] that some time in 2019, he and hundreds of other general population inmates initiated grievances protesting that HDSP placed protective custody inmates in charge of preparing breakfast and lunch for general population inmates. General population inmates complained that when other Nevada prisons made similar arrangements, the protective custody inmates deliberately contaminated food due to longstanding adverse relations with general population inmates. For example, protective custody culinary workers were accused of contaminating donuts with bleach and mixing human feces into peanut butter.

In response to these grievances, prison officials placed HDSP on a total lockdown two weeks prior to the protective custody inmates beginning to work in the culinary unit. Prison officials allegedly considered the general population inmates' grievances and refusals to eat unpackaged food as a "soft protest," which the officials used to justify a series of privilege reductions for both levels one and two inmates. ECF No. 10 at 5-6. Associate Warden Scally allegedly told Jackson that he wanted to create a "haves and have nots" relationship between levels one and two inmates. *Id.* at 6. Scally also said "it could get a lot worse" if inmates continued to file grievances and refuse to eat unpackaged food. *Id.* at 7.

The various lockdown procedures persisted through the COVID-19 pandemic, and restrictive conditions have continued despite no ongoing public health concerns. Because of the limited time allowed outside of cells, inmates' access to resources such as telephones, microwaves, and showers has been reduced, which led to increased competition between inmates

---

[2] All facts are taken from the first amended complaint (ECF No. 10).

2

for these resources. This competition has led to more violent incidents and suicides among inmates, which have in turn caused HDSP officials to implement more restrictions. Jackson and others have become "proxy mental health [counselors]" to other inmates suffering from increased anxiety. *Id.* at 10.

In the prison yard, officials replaced access to a large outdoor recreation area containing various amenities with a much smaller fenced area that guards jokingly call "the octagon" in reference to a mixed martial arts ring. *Id.* at 11. The octagon lacks equipment, restroom access, water fountains, and a doorbell inmates can use to call for help. The crowded octagon with fewer amenities leads to increased competition and violence and officers admit they are unwilling to enter to break up conflicts until backup arrives.

The restrictions Jackson describes also include reducing what had previously been one hour per day, seven days per week of yard time. After two years of no yard time during the pandemic, officials eventually restored the prior conditions of one hour per day. After the octagon was completed, officials reduced Jackson's yard time to four one-hour periods per week. Jackson asserts that the National Institute of Health recommends 3.55 hours of direct sunlight per day for persons of African descent to receive a healthy amount of vitamin D.

Coinciding with these restrictions on general population inmates' privileges, HDSP also shifted various privileges toward protective custody inmates at the expense of general population. Examples include relocating protective custody inmates to a unit with access to a better yard containing more amenities, shifting job opportunities from general population inmates to protective custody, and increasing the requirements for employment in prison industries jobs such as requiring an inmate to have a street I.D., high school diploma, and six months without any writeups. Officials then issued writeups for frivolous violations as a pretext

to bar general population inmates from working in prison industries, where most workers now come from protective custody.

According to Jackson, he and 70 percent of general population at HDSP are Black. Protective custody inmates, however, are approximately 60 percent white and only 15 percent Black. Jackson claims that similar restrictive policies have targeted facilities with majority Latino populations as well. When Jackson and others complained, officials responded by saying, "if only the Blacks would clean up their car" or "if only the Blacks would behave." *Id.* at 21.

## II. ANALYSIS

In considering a motion to dismiss, I take all well-pleaded allegations of material fact as true and construe the allegations in a light most favorable to the non-moving party. *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017). However, I do not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1163 (9th Cir. 2017). A plaintiff must make sufficient factual allegations to establish a plausible entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Such allegations must amount to "more than labels and conclusions, [or] a formulaic recitation of the elements of a cause of action." *Id.* at 555. A claim is facially plausible when the complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A. Exhaustion

The defendants argue that Jackson's claims should be dismissed because he failed to exhaust his administrative remedies before filing this lawsuit. They ask me to take judicial notice of exhibits filed in a separate case that include summaries of Jackson's relevant

4

grievances. Jackson responds that he exhausted his grievances and, even if he did not, exhaustion should not be decided at the dismissal stage.

The Prison Litigation Reform Act (PRLA) requires prisoners to exhaust all available administrative remedies prior to bringing a lawsuit under federal law. 42 U.S.C. § 1997e(a). Failure to exhaust is an affirmative defense under the PLRA, and inmates do not need to specially plead or demonstrate exhaustion in their complaints. *Jones v. Bock*, 549 U.S. 199, 216 (2007). In "rare cases where failure to exhaust is clear from the face of the complaint, a defendant may successfully move to dismiss" under Federal Rule of Civil Procedure 12(b)(6). *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (en banc).

When considering a motion to dismiss, I must "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling Rule 12(b)(6) motions to dismiss," such as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). I may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

It is not clear from the face of Jackson's complaint that he failed to exhaust his administrative remedies. Jackson refers to several internal grievances that he filed but does not describe the outcomes, appeals, or final disposition of those grievances. The defendants ask me to take judicial notice of the grievance summaries attached as exhibits to a filing in another active case in this district. I may take judicial notice of the fact that the exhibits were filed, but I decline to take judicial notice of the exhibits' contents because the accuracy of those contents

may be reasonably questioned. I therefore deny the defendants' motion to dismiss for failure to exhaust administrative remedies, without prejudice to raising this defense with proper evidentiary support.

### B. First Amendment retaliation

#### 1. Failure to state a claim

The defendants argue that Jackson was one of hundreds of inmates who filed similar grievances over the protective custody inmates working in culinary and that the defendants' actions applied to all inmates at the institution, not just those who complained. They thus contend that Jackson has not plausibly alleged that the defendants acted against him due to his protected conduct in filing grievances. Jackson responds that adverse action taken against all inmates in response to many of them engaging in protected conduct does not defeat his individual claim.

Prisoners retain their rights to petition the government for the redress of grievances. *See Turner v. Safley*, 482 U.S. 78, 84 (1987). "Because purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield." *Johnson v. Ryan*, 55 F.4th 1167, 1201 (9th Cir. 2022) (simplified). A claim for First Amendment retaliation requires Jackson to plausibly allege (1) a state actor took adverse action against him (2) because of (3) Jackson's protected conduct, and the action (4) chilled the exercise of his First Amendment rights and (5) did not reasonably advance a legitimate correctional goal. *Chavez v. Robinson*, 12 F.4th 978, 1001 (9th Cir. 2021). Jackson need not allege a total chilling of his First Amendment rights, only that the "official's acts would chill or silence a person of ordinary

firmness from future First Amendment activities." *Rhodes v. Robinson*, 408 F.3d 559, 568-69 (9th Cir. 2005) (quotation omitted).

Jackson plausibly alleges that he and hundreds of others engaged in protected conduct by filing grievances about protected custody inmates preparing their food. Prison officials then allegedly took adverse action against all inmates by imposing lockdowns and imposing restrictions on levels one and two inmates at HDSP. These actions would chill the speech of an inmate of ordinary firmness because Jackson described how reduced time out of cell and access to prison resources increases competition and violence in the facility and causes increased anxiety among inmates. Jackson alleges that these restrictions were because of the inmates' grievances and refusal to eat unpackaged food rather than a legitimate correctional goal because officials told him they considered the inmates' actions to be a "soft protest" and that "it could get a lot worse" if they persisted. ECF No. 10 at 6-7. Jackson has plausibly alleged the elements of a First Amendment retaliation claim.

2. Qualified immunity

The defendants argue that even if Jackson plausibly alleged a First Amendment violation, they are entitled to qualified immunity because the law was not clearly established. Jackson responds that inmates' right to be free from retaliation for filing grievances was clearly established at the time by *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005).

In evaluating whether qualified immunity applies, I "must determine whether: (1) the facts adduced constitute the violation of a constitutional right; and (2) the constitutional right was clearly established at the time of the alleged violation." *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 617 (9th Cir. 2018) (quotation omitted). I may answer these questions in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Jackson bears the burden of showing the right

at issue was clearly established. *Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Stewart v. Aranas*, 32 F.4th 1192, 1195 (9th Cir. 2022) (quotation omitted). Jackson does not necessarily need to point to a case directly on point, but existing caselaw "must place the lawfulness of the particular action beyond debate." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 969 (9th Cir. 2021) (simplified). Furthermore, I must define the right "at the appropriate level of specificity, and not at a high level of generality," before determining if it was clearly established. *Id.* at 968-69 (simplified).

Because Jackson has plausibly alleged retaliation in violation of the First Amendment, I must determine if that right was clearly established in 2019 when the first retaliatory acts occurred. Jackson points to *Rhodes v. Robinson*, which involved an inmate who filed a grievance against a prison official after his typewriter was returned from a repair shop in a damaged condition. 408 F.3d at 563. After the officer in question retaliated by confiscating other property, the inmate and approximately 120 other inmates filed a group appeal against the officer for allegedly damaging inmates' personal property. *Id.* at 563-64. Officials further retaliated by threatening to transfer the inmate to another facility, destroying his property, and subjecting him to a lengthy strip search. *Id.* at 564-65.

Denying the officers qualified immunity, the Ninth Circuit reiterated its "firm recognition that the prohibition against retaliatory punishment is clearly established law in the Ninth Circuit, for qualified immunity purposes." *Id.* at 569 (quotation omitted). The *Rhodes* Court relied on other cases of unlawful retaliation including repeated threats of transfer, retaliatory imposition of confinement and loss of television, double-celling a prisoner solely in retaliation for protected speech, and calling an inmate a "snitch" in front of other prisoners. *Id.* at 568. Taking Jackson's

8

allegations as true, *Rhodes* would put any reasonable prison official on notice that imposing lockdowns, reducing privileges by prisoner level, and threatening that "it could get a lot worse" as retaliation for filing grievances would be unconstitutional. Accordingly, I deny the defendants' motion to dismiss Jackson's First Amendment retaliation claim.

### C. Eighth Amendment cruel and unusual punishment

Jackson alleges two violations of the Eighth Amendment's prohibition against cruel and unusual punishment based on the conditions of his confinement. First, he alleges that the reduction in time out of cells and the transition from the larger yard to the octagon caused increased competition among inmates for scant prison resources, leading to increased violence and anxiety. Second, Jackson alleges that the reduction in yard time from seven hours per week to four was cruel and unusual punishment.

The defendants argue they are entitled to qualified immunity for the Eighth Amendment claims, but they do not contend that Jackson's complaint fails to state an Eighth Amendment claim. Rather, they argue there is no clearly established law to put them on notice that their conduct was unconstitutional. Jackson asserts that the right to be free from unconstitutionally dangerous confinement conditions is clearly established by *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).

Because the defendants do not argue that Jackson has not plausibly alleged an Eighth Amendment violation, they would be entitled to qualified immunity only if Jackson cannot show that clearly established law prohibited their conduct. In *Johnson*, inmates at two prison housing units were forced to remain outdoors in the prison yard for 17 hours and 4 days, respectively, following riots in the housing units. *Id.* at 729-30. The inmates were not given adequate access to food, water, shelter, or bathroom facilities. *Id.* The Ninth Circuit reversed the district court's

9

grant of summary judgment to the prison officials, holding that the Eighth Amendment prohibits deliberate indifference while depriving inmates of "substantial deprivations of shelter, food, drinking water, and sanitation." *Id.* at 732. "The circumstances, nature, and duration of a deprivation of these necessities must be considered in determining whether a constitutional violation has occurred." *Id.* at 731. "The more basic the need, the shorter the time it can be withheld." *Id.* (quotation omitted).

The facts of *Johnson* are too dissimilar to Jackson's allegations to put the defendants on notice that their actions at HDSP violated the Eighth Amendment. Unlike the lengthy, and often complete, deprivation of basic needs in *Johnson*, Jackson alleges that HDSP inmates have reduced access to privileges that are not basic needs, such as the microwaves and phones. And although showers and sanitation are basic needs, Jackson has not adequately alleged that he is deprived of sanitation to the same degree as in *Johnson*. Similarly, an hour-long exposure to the decreased amenities of the octagon as compared with the previous yard space are not prolonged enough to constitute a substantial deprivation that is comparable to the 17-hour or longer deprivations in *Johnson*. Finally, *Johnson* is silent on access to outdoor recreation as a substantial deprivation, so it cannot serve as notice that the reduction in yard time from seven to four hours per week constitutes an Eighth Amendment violation. Consequently, Jackson has not met his burden of showing clearly established law for these violations. I therefore grant the defendants' motion to dismiss Jackson's claims under the Eighth Amendment for cruel and unusual punishment based on the conditions of confinement because the defendants are entitled to qualified immunity on those claims.

"A pro se litigant must be given leave to amend his or her complaint, and some notice of its deficiencies, unless it is absolutely clear that the deficiencies of the complaint could not be

cured by amendment." *Cato v. United States*, 70 F.3d 1103, 1106 (9th Cir. 1995). Additionally, I should freely give a party leave to amend his complaint when justice so requires. Fed. R. Civ. P. 15(a)(2). Because it is not clear that amendment would be futile, I grant Jackson leave to amend his complaint if he is able to plausibly allege facts to show a violation of clearly established Eighth Amendment rights.

### D. Fourteenth Amendment discrimination

#### 1. Failure to state a claim

The defendants argue that Jackson fails to plausibly allege that their actions were intentionally directed at Black inmates. They further contend that Jackson alleges that the policies also affected Latino inmates, so he does not plausibly allege discrimination against Black inmates. Finally, they assert that general population inmates are not a suspect class under the Fourteenth Amendment. Jackson responds that the impacts on Latino inmates are driven by the same preference for the whiter protective custody population, which reinforces his racial discrimination argument.

"Prisoners are protected under the Equal Protect Clause of the Fourteenth Amendment from invidious discrimination based on race." *Harrington v. Scribner*, 785 F.3d 1299, 1305 (9th Cir. 2015) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974)). Where a policy is facially neutral regarding race, "[p]roof of discriminatory intent is required to show that state action having a disparate impact violates the Equal Protection Clause." *McLean v. Crabtree*, 173 F.3d 1176, 1185 (9th Cir. 1999). The discriminatory purpose need not be the dominant or primary one, so long as it is a motivating factor in the policy. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

Although the defendants suggest that Jackson is complaining about a policy targeting different inmate classifications, which are not suspect classes under the Fourteenth Amendment, Jackson's complaint alleges that the facially neutral policies favoring protective custody inmates have a disproportionate impact on Black and Latino inmates. Jackson has alleged that most general population inmates at HDSP are Black while only a small percentage of HDSP protective custody inmates are Black. Although Latino inmates make up most of the general population at other facilities with similar policies, the result is the same: preferred treatment for the whiter protective custody inmate population.

Because the policies favoring protective custody inmates are facially neutral with respect to race, Jackson must also show discriminatory intent. Jackson plausibly alleges that when general population inmates complained about the policies, officials told them they might ease the restrictions "if only the Blacks would clean up their car" or "if only the Blacks would behave." ECF No. 10 at 21. These statements imply that the policies have a racially discriminatory motive. Jackson has therefore plausibly alleged facts to support a Fourteenth Amendment disparate impact claim.

### 2. Qualified immunity

The defendants assert that they are entitled to qualified immunity for Jackson's Fourteenth Amendment claim. They argue that "Jackson fails to allege Defendants treated Black inmates at HDSP different that (sic) other inmates, and he confirms that the policies at issue allegedly negatively affected Latino inmates at other facilities." ECF No. 17 at 18. This argument appears to attack only the first prong of the qualified immunity analysis, that no constitutional violation occurred. Because Jackson plausibly alleges a Fourteenth Amendment violation, I deny the defendants' motion to dismiss based on qualified immunity.

### III. CONCLUSION

I THEREFORE ORDER that the defendants' motion to dismiss (**ECF No. 17**) is **GRANTED in part and DENIED in part**. The motion is granted in that I dismiss Jackson's Eighth Amendment claims. The motion is denied as to his claims under the First and Fourteenth Amendments.

I FURTHER ORDER that by February 18, 2025, Jackson may file an amended complaint to cure the deficiencies identified in this order. If he does not amend by that date, this case will proceed with his First and Fourteenth Amendment claims.

DATED this 15th day of January, 2025.

_____
ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE